## Bullock v. Young.

Dec. 16, 1941.

C. F. Kelly for appellant.

Allen, Duncan & Duncan for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

In April, 1930, the appellee, plaintiff below, brought this action in the Fayette circuit court against appellant, defendant below, to recover the value of 120 shares of stock of the Carrs Fork Coal Company, a Kentucky corporation. Plaintiff alleged that he purchased the stock of defendant and had paid for same, and that defendant had refused to deliver the stock. Plaintiff alleged that he demanded of defendant the delivery of the stock on January 25, 1926, and at that time and for sometime thereafter, the stock was worth $150 per share, aggregating the sum of $18,000, which sum he prayed to recover.

Defendant denied the material allegations of the petition and pleaded affirmatively that with the consent of the plaintiff he, defendant, had pledged the 120 shares

of stock as collateral security on a note which he and plaintiff had jointly executed and which stock had continued as collateral on succeeding renewal notes until the final renewal of a note for $4,000 to the First National Bank and Trust Company, of Lexington, Kentucky, dated June 6, 1931; that upon maturity of this note the Lexington bank brought suit and obtained judgment thereon and the 120 shares of stock in question were sold in part satisfaction of the judgment. Plaintiff does not deny that 120 shares of Carrs Fork Coal Company stock were sold in satisfaction of the $4,000 note which was a renewal of a part of an original note of $15,000 executed to the First National Bank of Hazard, Kentucky, but he denied that the stock sold by the Lexington bank was the stock that he had purchased of defendant and paid for, and alleged that the stock sold belonged to defendant.

The facts and transactions out of which this controversy arises are, in substance, these: In June, 1923, defendant purchased from F. A. Crossman 650 shares of stock in the Carrs Fork Coal Company at $100 per share and paid a part of the purchase price in cash and executed to Crossman twenty-four $1,000 notes payable monthly. It appears that Crossman refused to accept as collateral security stock in the Carrs Fork Coal Company and defendant pledged other collateral. It is agreed that defendant agreed to sell plaintiff 150 shares of the stock that he, defendant, purchased from Crossman at the same price, namely, $100 per share. In this transaction between the parties it was arranged that plaintiff should sign the last fifteen of the $1,000 series of notes which defendant had executed to Crossman in the purchase of the stock from the latter, and that 150 shares of the Crossman stock should be transferred to plaintiff; that plaintiff should transfer the stock to F. E. Wood, apparently as trustee, who in turn would endorse the stock in blank and plaintiff would deliver the stock to defendant as collateral security for the payment by plaintiff of the last fifteen $1,000 notes. In pursuance of this arrangement certain stock certificates referred to in the record as "Crossman" certificates (meaning certificates representing the stock which defendant had purchased of Crossman and sold to defendant) were transferred to plaintiff designated as certificates Nos. 260, 261 and 262 for fifty shares each, and plaintiff transferred the same stock to Wood by certificates Nos. 264,

265 and 266, each for fifty shares. Wood endorsed the certificates in blank, returned them to plaintiff, and the latter forwarded them to defendant to be held by the latter as collateral security on the purchase price of the stock that plaintiff had purchased from defendant.

We note, however, that there is some confusion or difference between counsel for the respective parties as appears in the briefs, regarding the numbers borne by the stock certificates issued to plaintiff representing the stock he had purchased from defendant. The numbers set out above are set out in plaintiff's petition and brief. In response to that defendant's counsel, in his brief, says:

"While it is alleged in the petition that Certificates Nos. 264, 265 and 266 issued to and were delivered to Young, the truth is, no such thing happened. When Young purchased the 150 shares of stock, he received from F. A. Crossman the following Certificates of stock: Nos. 133, 134, 154, 224, each for 25 shares and No. 206 for 50 shares, totaling 150 shares. Young surrendered these Certificates to the Carrs Fork Coal Company and had new certificates issued in his name; Viz. Nos. 260, 261 and 262 each for 50 shares. Young then transferred these Certificates to Frank E. Wood, and upon their surrender for cancellation there issued to Wood, Certificates Nos. 264, 265 and 266, each for 50 shares of stock. The transfer of these Certificates by Young to Wood was not an outright sale. Young remained the real owner thereof."

We cannot see any difference between the two theories in their final analysis, since in either event the certificates representing the Crossman stock that plaintiff had purchased of defendant were issued and finally came into the hands of Wood as trustee for plaintiff. Hence, it is not material that the parties may be confused with respect to the exact number of the certificates. It is further admitted in brief of appellant that in any event the Crossman stock certificates issued to plaintiff were sent to defendant by Wood to be used as collateral on the Crossman notes to defendant. Numerous other cancellations of certain certificates and reissuance of other certificates bearing numbers different from the ones cancelled, and many other confusing transactions appear throughout the record, all or practically all of which was

done by defendant. The stock purchased by defendant of Crossman was a minority of the stock, leaving control of the Carrs Fork Coal Company in the hands of certain rival nonresident stockholders referred to in the record as the "Portsmouth crowd." Defendant, desiring to wrest control of the company from the other stockholders, effected a "pooling" agreement by the terms of which defendant and those associated with him transferred their stock to a trustee named in the agreement in order that the stock could be voted in a block. In carrying out this arrangement the Crossman stock certificates representing the stock purchased of defendant by plaintiff were cancelled and 140 shares of plaintiff's Crossman stock were transferred to the trustee under the pooling agreement. The remaining 10 shares were retained in the name of F. E. Wood in order that he might act as a director of the corporation. The trustee then issued for the benefit of plaintiff, though in the name of Wood, three certificates, one for 40 shares and the other two for 50 shares each, which by plaintiff's consent were assigned by Wood to the First National Bank of Hazard as collateral on the $15,000 note.

We will first give plaintiff's contention regarding the execution of the $15,000 note to the Hazard bank. Plaintiff and defendant desired to get control of the majority of stock in the Carrs Fork Coal Company; plaintiff, defendant, and L. H. Stone owned all the stock of the Wallins Creek Coal Company, which latter company owned all of the stock of the Kentucky Jewel Coal Company. It was first planned to have the Wallins Creek Coal Company purchase the stock of the Kentucky Jewel Coal Company but this plan was abandoned when they were advised that the Carrs Fork Coal Company could not legally own the stock and that the "Portsmouth crowd" would take advantage of the fact and prevent the voting of the stock by Wallins Creek Coal Company at the stockholders' meeting. It was then decided that plaintiff, defendant, and Stone would purchase the stock of the Carrs Fork Coal Company owned by T. F. McConnell and W. J. Raybould who had refused to pool their stock with defendant and his associates. In order to finance this purchase, plaintiff, defendant, and Stone executed their joint note to the Hazard bank for $15,000 and later, with plaintiff's consent, defendant deposited with the Hazard bank the 150 shares of plaintiff's Crossman stock held by him.

It is plaintiff's contention that as between himself, the defendant and Stone, the $15,000 Hazard bank note was no obligation of his; that while he was jointly liable to the bank on the note it was understood and agreed between the signers of the note that his co-signers, defendant and Stone, would take care of the note. He says that it was understood and agreed that he was to purchase only such stock as his salary would pay for, and that he paid twelve of the $1,000 notes which defendant executed to Crossman; that the Wallins Creek Coal Company paid one of the other notes, and defendant paid the other two, and since he paid twelve of the notes, or $12,000, that amount paid for 120 shares of the stock he purchased of Crossman.

The Hazard bank note was reduced to $6,000, and the bank still insisting on payment of this balance, on December 14, 1936, defendant borrowed $6,000 from the Phoenix and Third National Bank at Lexington (which bank was subsequently merged with and became the First National Bank and Trust Company), with the understanding that the collateral on the Hazard bank note would be pledged as collateral. It appears that at that time, through defendant who was negotiating all the transactions, 123 shares of Carrs Fork Coal Company stock were pledged to the Lexington bank as collateral on the $6,000 note but later reduced to 120 shares. The Lexington bank note was renewed from time to time until June 26, 1931, when the last renewal note was executed which was sued on by the Lexington bank, and the 120 shares of stock pledged as collateral were sold.

Defendant pleads and testifies that the 120 shares of the Crossman stock which plaintiff had paid for was the same stock that was originally pledged to the Hazard bank and later sold by the Lexington bank, and insists that inasmuch as the note was jointly executed by both plaintiff and defendant and had been sold in part satisfaction of that obligation, and that since defendant had paid the balance of the judgment, plaintiff had no claim against defendant for failing to deliver the Crossman stock that plaintiff had paid for.

The record shows that the first note executed to the Lexington bank was on December 14, 1926, and prior to this time, namely, May 28, 1926, the pooling agreement was dissolved and the trustees transferred the stock held by them to the persons entitled thereto. In this

transfer of the pooled stock there were issued to Wood certificate No. 333 for 20 shares, and certificate No. 334 for 150 shares. Plaintiff claims that the reason for issuing certificate No. 333 for 20 shares was that during the pooling agreement defendant purchased trustee certificates for 30 shares and instead of having the trustee transfer to plaintiff 30 shares they transferred only 20 shares and Wood retained for himself certificate No. 270 for 10 shares which had come out of plaintiff's 150 shares purchased from Crossman. There was also issued to Wood out of the pooled stock certificate No. 334 for 150 shares, representing the Crossman shares purchased by plaintiff from defendant. Later on, namely, January 27, 1927, defendant cancelled certificate No. 334 for 150 shares representing plaintiff's Crossman stock and caused to be issued to himself, defendant, certificate No. 331 for 120 shares, also representing plaintiff's Crossman stock; and also issued certificate No. 362 for 20 shares that defendant had paid for, and certificate No. 363 for 10 shares which the Wallins Creek Coal Company had paid for. It was stipulated that plaintiff had no interest in the 30 shares of stock which had been paid for by defendant and the Wallins Creek Coal Company.

On December 11, 1928, defendant sold to Wood and G. S. Monroe 350 shares and in this transfer was included certificate No. 361 for the 120 shares representing plaintiff's Crossman stock. It is earnestly insisted for plaintiff that in these circumstances and proven facts that after December 11, 1928, it was impossible for defendant to pledge as security on the Lexington bank note any certificate representing plaintiff's 120 shares. It is to be noted that while the original note executed to the Lexington bank was dated December 14, 1926, it was renewed from time to time and the collateral posted on the renewal sued on, dated June 6, 1931, which was more than two years after the transaction on December 12, 1928, whereby defendant transferred to Wood and Monroe certificate No. 361 which represented plaintiff's 120 shares of Crossman stock.

It is further shown by the record that on the renewal note to the Lexington bank, dated December 3, 1929, the collateral consisted of 123 shares and defendant admits that the 123 shares consisted of certificate No. 330 for 103 shares issued out of the pooled stock to the Kentucky Jewel Coal Company, and certificate No. 376

(formerly No. 361) for 20 shares issued to defendant which came out of certificate No. 334 for 150 shares transferred by the trustees to Wood, and represented the 20 shares of Crossman stock which defendant paid for as stated above. Defendant admits that this is true and offered as an explanation that the use of the Kentucky Jewel Coal Company stock as collateral was merely temporary and to enable him to break down plaintiff's certificate so as to deposit on the note the 120 shares belonging to plaintiff. It appears, however, that this "temporary" situation continued from December 3, 1929, until the last renewal note on June 6, 1931, when the collateral was reduced from 123 shares to 120 shares.

In reference to plaintiff's contention that the $15,000 note executed to the Hazard bank, of which the Lexington bank note of $6,000 was a continuation or part, was not plaintiff's obligation as between himself and defendant, certain correspondence between the parties relative thereto appear in the record. One letter dated May 21, 1931, written by defendant to plaintiff (omitting caption, signature, etc.), reads:

"I have a letter from the First National Bank & Trust Company, copy of which is attached, asking that payment be made upon the note which we hold there amounting to $4000.00, and suggesting that $1000.00 each 90 days be paid upon the note until it is paid in full.

"Will you kindly express your wishes in connection with this obligation. The note falls due on May 29th, which is within the next few days. It is secured by 120 shares of Carrs Fork Coal Company stock which is part of 150 shares that you agreed to take and pay for some time ago."

Plaintiff insists that the statement in the above letter that the note was secured by 120 shares of Carrs Fork Coal Company stock which is a part of the 150 shares that plaintiff agreed to take was not true, since it was shown by the record that 123 shares were then pledged on the current note which was renewed on June 6, 1931, and that this collateral included certificate No. 330 for 103 shares issued to the Kentucky Jewel Coal Company. On June 6, 1931, plaintiff wrote defendant, in reply to the letter quoted above, as follows:

"Acknowledging your letter of the 21st with

attached note for $4000.00, which I am returning with my signature with the usual reservations, please be advised that this is not any obligation of mine so far as the matter between you and me stands, and I will certainly not pay anything on it at any time.

"I have signed the above, as well as other notes from time to time simply because I signed the original, with the understanding at that time that I was only obligated to the extent of the amount of stock which my salary in the Carrs Fork Coal Company would purchase."

Plaintiff offers a different theory in reference to the "break down" process of numerous certificates bearing certain numbers and the issuance of other certificates representing the former ones but bearing different numbers, and according to his theory it would appear that the 120 shares of stock sold in part satisfaction of the Lexington bank note belonged to plaintiff and was sold in satisfaction of defendant's and plaintiff's joint obligation. He also denies that it was understood and agreed between himself and plaintiff that the $15,000 Hazard bank note, of which the Lexington bank note was a part or a continuation, was the obligation of defendant but insists that it was a joint obligation of plaintiff and defendant.

Upon the issues thus joined the evidence was taken, which is voluminous. In addition to the testimony of the various witnesses many exhibits are filed consisting of numerous letters between plaintiff and defendant over a period of years, and also record evidence taken from the stock books, banks, etc. The evidence is conflicting and more or less confusing.

The case was referred to the master commissioner of the Fayette circuit court, who is versed in the law, and after examining the record and hearing argument of opposing counsel the commissioner made his report, finding in favor of the plaintiff the sum of $18,000, the amount sued for. Exceptions were filed by defendant to the commissioner's report and the record again reviewed by the chancellor and resulted in an order overruling the exceptions and confirming the commissioner's report. Judgment was entered accordingly.

The commissioner wrote an opinion consisting of

about thirty typewritten pages, and it appears that he went into all details of the various transactions along the lines we have pointed out herein. In the commissioner's report he said, in part:

"It is conclusively shown by the evidence that on February 1st, 1930, the $4,000.00 note held by the First National Bank and Trust Company was secured by Certificate No. 330 for 103 shares of Carrs Fork Coal Company stock issued in the name of the Kentucky Jewel Coal Company and by certificate No. 376 for 20 shares issued to H. E. Bullock. Bullock testified that this was only a temporary arrangement and that these certificates were afterwards withdrawn and that certificates issued in the name of Bullock, but representing the 120 shares of stock owned by the plaintiff, were substituted therefor, and that plaintiff's stock was eventually sold under judgment in the foreclosure suit brought by the bank. The proof, however, shows that Bullock had disposed of Young's stock on December 11th, 1928, and that he did not have in his possession any certificate representing the Young stock on February 1st, 1930, or at any time thereafter.

"As between Young and Bullock, the plaintiff was not liable for any part of the obligations held by the First National Bank and Trust Company since all of the McConnell and Raybould stock for which the notes were executed was appropriated by Bullock. Even if Plaintiff's stock had been sold in the foreclosure suit and purchased by Bullock, it would have been the duty of the defendant to make restitution to the plaintiff, as the stock was sold to satisfy the defendant's obligation.

"The proof shows that on January 21st, 1926, plaintiff, through his attorney, J. S. Laurent, demanded of the defendant the return of the 120 shares of Crossman stock and that defendant refused to deliver said stock. At the time of said demand the evidence shows that the stock was of the reasonable market value of $150.00 per share. There is no evidence to the contrary, except the statement of Bullock who testified that at that time the majority stockholders of the Carrs Fork Coal Company would not sell their stock at any price and the minority stockholders could not sell at any price.

"The Commissioner finds from the evidence as a matter of fact:

"1. That on December 18th, 1923, the plaintiff, T. L. Young, the defendant, Harry E. Bullock, and one L. H. Stone, purchased from T. F. McConnell and W. J. Raybould 211 shares of stock in the Carrs Fork Coal Company at the price of $200.00 per share and agreed to pay therefor the total sum of $42,200.00; that at the time of said purchase there was no agreement as to the proportions in which said stock was to be divided between the respective purchasers; that on January 20th, 1924, the defendant, Harry E. Bullock, converted all of said 211 shares of stock to his own use and thereby released plaintiff, T. L. Young, from his obligation to pay to the defendant, or on behalf of the defendant any part of the consideration for the stock.

"2. That on December 11th, 1928, the defendant, Harry E. Bullock, converted to his own use 120 shares of the capital stock of the Carrs Fork Coal Company which was then owned by the plaintiff, T. L. Young, and which was held by the defendant for the use and benefit of the plaintiff under Certificate No. 361 of the Carrs Fork Coal Company issued in the name of Harry E. Bullock for said 120 shares of stock.

"3. That on January 21st, 1926, the plaintiff, T. L. Young, through his attorney, J. S. Laurent, demanded of the defendant, Harry E. Bullock, the return of said 120 shares of stock and that the defendant refused to return said stock or any part thereof.

"4. That the 120 shares of stock which was sold under the judgment of this court in action No. 17002 entitled First National Bank and Trust Company vs. Harry E. Bullock and T. L. Young, was owned by the defendant Harry E. Bullock and that no part of said stock was owned by said T. L. Young.

"5. That on January 21st, 1926, the 120 shares of stock of the Carrs Fork Coal Company owned by the plaintiff T. L. Young, and which had been converted by the defendant Harry E. Bullock to his own use on December 11th, 1928, was of the fair and reasonable market value of $150.00 per share, or the total value of $18,000.00."

Defendant takes issue with the commissioner and the chancellor and insists that they became confused and that the conclusions reached by them rest upon an erroneous theory. The rule is well known to the legal profession in this jurisdiction that this court will not reverse a chancellor and commissioner when they concur in a finding of fact unless we are convinced by clear and convincing evidence that such finding is contrary to the evidence. Without extending this opinion by a further discussion of the evidence, it is sufficient to say that upon examination of the record for ourselves we are unable to say that the finding of the commissioner and chancellor is contrary to the preponderance of the evidence.

There is a counterclaim involved, but since the conclusions we have reached above are conclusive of the counterclaim, we need not discuss that phase of the case.

Judgment affirmed.